[No. 23800.    Department One.    February 14, 1933.]

J. W. FALES COMPANY, *Respondent,* v. O. H. SEIPLE COMPANY *et al., Defendants,* E. C. WEBBER, *as Trustee, Appellant.*[1]

[1]Reported in 19 P. (2d) 118.

*Grinstad, Laube, Laughlin & Meakim, L. C. Brod-beck,* and *Venables, Graham & Howe,* for appellant.

*Smith, Matthews & Dunn* and *Elmer Goering,* for respondent.

*Kerr, McCord & Carey, Poe, Falknor, Falknor & Emory, S. N. Greenleaf, W. H. Abbott, Jay C. Allen, Andrew J. Balliet, Battle, Hulbert & Helsell, Bayley & Croson, Bogle, Bogle & Gates, Warren Brown, Jr., Dykeman, Monheimer & Griffin, Cosgrove & Terhune, Kenneth I. Ghormley, Robert D. Hamlin, Harroun, Maloy & Shidler, Hyland, Elvidge & Alvord, H. B. Jones, Benjamin M. Levine, Philip D. Macbride, Rob-erts, Skeel & Holman, Shorts & Denny, Russell F. Stark, Stratton & Kane,* and *Tanner & Garvin, Amici Curiae.*

632

MILLARD, J.—The O. H. Seiple Co., a domestic corporation organized January 20, 1926, and hereinafter designated the "Bellingham corporation," maintained offices and warehouses in Bellingham and Mt. Vernon. Originally, there were five trustees of the corporation, all of whom qualified. O. H. Seiple, president of the corporation, aided by his wife (Anna C. Seiple), who was secretary-treasurer of the corporation, had entire control of the business of this company. The proceeds of the accounts receivable were deposited (and paid on the corporation's checks) by the Bellingham corporation in its bank accounts in Bellingham and Mt. Vernon.

The O. H. Seiple Co. of Everett, hereinafter termed the "Everett corporation," was incorporated under the laws of this state, and maintained offices and warehouses at Everett. Its board of trustees consisted of O. H. Seiple, Anna C. Seiple, and James Constable, who were also trustees of the Bellingham corporation. The Everett corporation, like the Bellingham corporation, was engaged in a general grain, feed and warehouse business, and was also under the entire control of O. H. Seiple and Anna C. Seiple, who were president and secretary-treasurer, respectively, of both corporations. All collections of the Everett corporation were deposited in the name of O. H. Seiple in a bank in Everett. In that bank account were commingled Seiple's personal funds and the deposits of the Everett corporation; that is, Seiple had a personal bank account in which were kept his personal funds and moneys of the Everett corporation. From that fund, on checks drawn by Seiple, were paid Seiple's personal obligations and the Everett corporation's liabilities.

On demand note, executed June 14, 1929, the J. W. Fales Company made a loan of fifty thousand dollars

to the Bellingham corporation. That money was used by the corporation in paying its indebtedness of fifty thousand dollars to the Worthington Fisher Company, of which E. K. Worthington was the head. That note was renewed September 12, 1929, by the execution of five promissory notes of the Bellingham corporation, each in the sum of ten thousand dollars and maturing six months after date. The five notes were endorsed by O. H. Seiple and wife and by E. K. Worthington. On March 12, 1930, those notes were renewed by the execution of five other notes, which were endorsed in the same manner and which matured on or before ninety days after date.

From that date to April 21, 1930, the two corporations desired further financial aid. The J. W. Fales Company was apprised by E. K. Worthington of the desire of the two corporations for additional financial assistance for the operation of the business of the two corporations. Satisfied by its investigation of Seiple's moral and financial standing, the Fales company entered into a written agreement April 24, 1930, with the two corporations, to advance and lend to the two Seiple corporations not to exceed one hundred thousand dollars; that, while the Fales company was not obligated to advance any specified sum, in the event it advanced to the two corporations in excess of one hundred thousand dollars such excess was to be "secured in like manner as the first one hundred thousand dollars." To secure all amounts so advanced by the Fales company, the Bellingham and Everett corporations

". . . do hereby sell, transfer, set over and assign to first party (Fales company) all of the accounts receivable, whether evidenced by notes or otherwise and all earnings and income of whatsoever nature of second parties (the Bellingham and Everett

corporations) accruing during the life of this loan, said accounts receivable to at all times be at least 10% in excess of the total amount due first party (Fales company). It being understood and agreed that *any accounts receivable, note accounts, earnings or income of whatsoever nature created or accruing between the time demand is made by first party for payment and the date payment in full is actually made* to first party shall be considered as assigned to first party as security in the manner and to the extent herein provided.''

As drawn in April, 1930, the assignment was of all of the accounts receivable ''accruing during the life of this loan.'' As amended in September, 1930, the assignment applied to ''accounts receivable,'' etc., as shown in foregoing italicized portion of the agreement. The two corporations were obligated to execute and deliver to the Fales company, at the time of each loan or advancement, their promissory notes therefor, payable on demand, with interest payable monthly. Seiple and his wife, president and secretary-treasurer, respectively, of the two corporations, were required to sign those notes as principals and not as sureties. We observe, in passing, that notes were given to replace the earlier notes for fifty thousand dollars, and that none of the notes, subsequent in date to the ones described above and executed subsequent to the assignment agreement, bears the endorsement of E. K. Worthington, to whose company the two corporations paid their debt of fifty thousand dollars with the first money borrowed from the Fales company.

The Bellingham and Everett corporations, under the terms of their agreement with the Fales company, were required to render to the Fales company a financial statement on the twentieth of each month,

''. . . showing the affairs of each company and a complete list of all accounts receivable showing

the amount due and the date each account was incurred, which list of accounts receivable shall be attached to this agreement, covered by this assignment and made a part hereof. First party shall at any and all times have the right to inspect the books and records of second parties.''

O. H. Seiple, president and manager of the two Seiple corporations, named as the third party in the agreement, was appointed as agent of the Fales company to

'' . . . collect all accounts receivable and to apply the proceeds as follows: Out of the first moneys collected third party (O. H. Seiple) shall first pay all accrued interest due. So long as there remain due and owing to second parties (the two Seiple corporations), accounts receivable which are not past due or uncollectible, and 10% in excess of all amounts due first party (the Fales company), and no demand has been made by first party for payment of amounts due, the proceeds collected by third party (O. H. Seiple) may be turned over to second parties (the two Seiple corporations) as their interest may appear and such amounts to be thereupon released from this assignment, provided, however, that all such amounts shall be used by second parties (the two Seiple corporations) in the business of said companies.''

The assignment agreement was properly executed by all parties. At subsequent dates, amendments in the original agreement were ratified by the stockholders and trustees of the two corporations. A list of accounts receivable, as of May 1, 1930, was attached to the agreement. As stipulated, monthly thereafter, to and including November 1, 1930, such lists were added. Including the original loan of fifty thousand dollars, the Fales company advanced to the two corporations, from time to time, up to and including October 3, 1930, a total of one hundred and fifty thousand dollars.

In June, 1930, the total advances by the Fales company to the two Seiple corporations aggregated one hundred thousand dollars; at which time, and thereafter, Mr. Fales, who handled the loans for the Fales company, testified the accounts receivable did not equal the ten per cent over the amount of the loan. The lender refused to make further advances unless the borrowers gave additional security for the loans. To secure the last advances, amounting to fifty thousand dollars, O. H. Seiple and wife executed, in June, July and October, 1930, three deeds, which were not placed of record, conveying real property owned by them in Whatcom and Snohomish counties, Washington, and in Douglas county, Oregon, to the Fales company.

The two corporations punctually paid the monthly interest on the loans until the loan was called by the Fales company in December. From the time of the execution of the assignment agreement to July 20, 1930, Mr. Fales, of the Fales company, conferred frequently with Mr. and Mrs. Seiple for the purpose of closely watching the affairs of the two corporations and, doubtless, for the purpose of assuring himself that the loans made by his company were properly safeguarded. It appears that Mr. Fales had implicit faith in Mr. Seiple. From July 20, 1930, to September 16, 1930, Mr. Fales was in the east, and hence there were no conferences during that period. Between September 16, 1930, and October 1, 1930, Mr. Fales conferred with Mr. Seiple once or twice. About the latter date, Mr. Seiple went east and no further conferences were had until sometime in November, when Mr. Seiple returned to this state. Shortly thereafter, Mr. Seiple absented himself from his business on account of sickness.

On December 1, 1930, during the absence of Mr.

Seiple from his business on account of personal illness, Mr. Fales had a conference with Mrs. Seiple. Mr. Fales then learned that Mr. Seiple had not employed, as he had promised in the fall of 1930, a certified accountant to make the monthly audit and statement demanded by the Fales company. The Fales company immediately "called" its loan and, on December 2, 1930, in writing, advised Mr. and Mrs. Seiple as follows:

"Mrs. Anna Seiple
Mr. O. H. Seiple     O. H. Seiple Co.     Dec. 1st, 1930.
"Owing to the present condition of business it seems best for us to exercise our option of taking our security consisting of cash, accounts receivable, notes and monies in liquidation of our loan of $150,000, plus accrued interest. We therefore advise you that starting with the morning of Dec. 2nd you are to turn in to us all monies until our loan is extinguished."

Seiple was dismissed as the agent of the Fales company, which sent its representative to Bellingham on December 2, 1930, to take charge of the collection of the accounts receivable. Debtors of the two corporations were informed of the assignment. On December 1, 1930, the assets of the two corporations aggregated $156,560.12. The liabilities of the two corporations amounted to $384,425.80.

On December 27, 1930, the Fales company commenced an action against the two Seiples and against the two Seiple corporations—during the pendency of the action a receiver was appointed for the two corporations and was made a party defendant—to recover one hundred and fifty thousand dollars. Plaintiff also prayed that it be granted the exclusive right to collect the accounts receivable of the two corporations and apply the proceeds upon the amount due the plaintiff; that the deeds described above, conveying

certain lands to the plaintiff, be declared to be mortgages and foreclosed as such, and that the plaintiff be decreed to have a first lien upon the lands described; and that a receiver be appointed to take charge of the property covered by the assignment and deeds.

On January 17, 1931, O. H. Seiple and wife, and on March 31, 1931, the two Seiple corporations, filed voluntary petitions in bankruptcy. E. C. Webber was appointed trustee in bankruptcy of the estates of the three bankrupts. The trustee in bankruptcy intervened in the action instituted by the Fales company; that is, the contest became one between the plaintiff and the trustee in bankruptcy, representing the creditors of the bankrupt defendants, as to whether plaintiff's security was valid as against the creditors of the bankrupts. After the institution of the receivership and the bankruptcy proceedings, the parties stipulated that plaintiff, as trustee, was to collect accounts receivable and place the proceeds in a special bank account pending the determination of rights thereto. Prior to the stipulation, the receiver of the two corporations collected accounts receivable amounting to $2,897.50, which money was turned over to the trustee in bankruptcy.

The court was of the view that plaintiff was entitled to judgment in the amount of its loans; that the assignment of all the accounts receivable constituted a valid pledge and assignment thereof; that the plaintiff was entitled to apply its collections upon the judgment indebtedness; that the proceeds ($2,897.50) of the accounts receivable in the possession of the trustee in bankruptcy should be delivered to plaintiff and applied on the judgment; that the uncollected accounts receivable should be sold at public sale and the proceeds of the sale applied upon plaintiff's judgment; that the real property conveyed to the plaintiff by the

Seiples should be sold and the proceeds applied to plaintiff's judgment; and that the right of the trustee in bankruptcy, representing the creditors of the bankrupts, is subordinate to the lien of plaintiff's assignment and mortgage deeds. Decree was entered accordingly. The trustee in bankruptcy has appealed.

Did the agreement of April 24, 1930, constitute an assignment of the accounts receivable, note accounts, earnings and income of the defendant corporations?

The assignment was invalid as to the rights of third parties, inasmuch as there was no surrender by the assignor of dominion and control of the subject matter of the assignment, and assumption of dominion and control of that subject matter by the assignee. There is no showing of actual intent on the part of the respondent to defraud the creditors of the two defendant corporations; however, as to third parties the assignment was invalid in law.

The assignment of April 24, 1930, was made by the defendant corporations to secure, in a certain manner, an existing loan of fifty thousand dollars and further advances not to exceed one hundred thousand dollars. In the event of further advances in excess of one hundred thousand dollars, such excess was to be "secured in like manner as the first one hundred thousand dollars." The assignment included all accounts receivable then outstanding, and all earnings and income accruing during the life of the loan. A list of the accounts then existing was delivered at the time of the execution of the agreement. It was agreed, and the corporations observed that condition of the contract, that similar lists were to be delivered to the respondent pledgee monthly thereafter. The accounts receivable were required to be, at all times during the life of the loan, at least ten per cent in excess of the total

amount due the respondent. The receivables were *not* to be collected by the respondent assignee. The receivables were to be collected by the president and manager of the two corporations, as agent of the respondent.

Under the facts as recited above, this was nothing more or less than a collection by the pledgor corporations. Respondent had the right to require—with this condition the defendant corporations complied—out of the moneys collected, payment of the interest accruing monthly on the loans. The contract also provided that, so long as the accounts receivable were ten per cent in excess of the amount due the respondent pledgee, the money collected by the corporations' president, respondent's agent, was to be turned over to the defendant corporations for use in the business of the two corporations if "no demand has been made by first party (respondent assignee) for payment of amounts due;" that is, until required by the respondent to do so, the corporations were not required to apply any of the collections—other than the payment of monthly interest—to the repayment of respondent's loans to the defendant corporations. Other than stated above, there was no provision requiring the corporations to account in any way to the respondent.

It is true that the contract provided that the respondent should have the right to inspect the books and records of the defendant corporations at any time. There is no evidence that respondent ever availed itself of that provision. There is no evidence that the accounts receivable were in any manner so marked in the ledgers as to indicate they were assigned. We do not find in the record before us that the respondent closely supervised the business of the two corporations. The respondent, from the beginning, had implicit faith in Seiple.

There is testimony that a representative (Mr. Fales) frequently conferred with Mr. Seiple in order to assure himself that the loans made by his company were properly safeguarded. For the period from July 20, 1930, to September 16, 1930, it appears there were no conferences because of Mr. Fales' absence in the east; that, from October 1, 1930, until sometime in November, Mr. Seiple's absence in the east precluded conferences respecting the business of the corporations; that, during Mr. Seiple's absence from his office December 1, 1930, Mr. Fales obtained information which convinced him that the loan should be "called." That was done on December 2, 1930, and a representative of the respondent was placed in charge of the Bellingham corporation; that is, the respondent then exercised "our option of taking our security consisting of cash, accounts receivable, notes and moneys in liquidation of our loans."

Until the representative of respondent took charge of the business of the corporations, the assignment was kept secret. Not until that time was notice of the pledge brought home to the debtors of the corporations; and not until that date was there an assertion of dominion by the respondent assignee over the subject matter of the pledge or assignment.

On facts very little different from the facts in the case at bar, the United States supreme court held, in *Benedict v. Ratner,* 268 U. S. 353, that the arrangement was for the unfettered use by the borrower of the proceeds of the accounts, which precluded the effective creation of a lien and rendered the original assignment fraudulent in law. The facts in that case are as follows: The Hub Carpet Co. executed an assignment on May 23, 1921, to Ratner, to secure an existing loan of fifteen thousand dollars and further

advances not exceeding fifteen thousand dollars, which advances were made July 1, 1921. That assignment included all accounts receivable then outstanding, and all which should thereafter accrue in the ordinary course of business. A list of the existing accounts was delivered at the time of the making of the agreement. Similar lists were to be delivered monthly thereafter to Ratner. The receivables were to be collected by the borrower (no different, in fact, than in the case at bar, under the circumstances). Ratner had the right, under the agreement, to demand at any time a full disclosure of the business and financial conditions. The lender had the right to require that all amounts collected be applied in payment of his loans, and to enforce the assignment although no loan had matured. The right of the lender in the case at bar was no different. Until Ratner did so, the company was not required to apply any of the collections to the repayment of Ratner's loans. So, too, in the case at bar, the borrowers were not required to apply any of the collections to the repayment of the Fales company's loans, if respondent did not so require.

There was no requirement that the borrower replace accounts collected by other collateral of equal value. In fact, the borrower was not required to account in any way, other than to submit the monthly lists of accounts to the lender. The borrower there, as in the instant case, was at liberty to use the proceeds of accounts collected as the borrower saw fit, unless the lender demanded payment of the loans. There, the existence of the assignment was to be kept secret. In the case at bar, the assignment was kept secret until December 2, 1930. The business was to be conducted as theretofore. The court held that the arrangement of May 23 was void, and said:

"But it would seem clear that whether the collateral consist of chattels or of accounts, reservation of dominion inconsistent with the effective disposition of title must render the transaction void. . . . A title to an account good against creditors may be transferred without notice to the debtor or record of any kind. But it is not true that the rule stated above and invoked by the receiver is either based upon or delimited by the doctrine of ostensible ownership. It rests not upon seeming ownership because of possession retained, but upon a lack of ownership because of dominion reserved. It does not raise a presumption of fraud. It imputes fraud conclusively because of the reservation of dominion inconsistent with the effective disposition of title and creation of a lien.

. . .

"The results which flow from reserving dominion inconsistent with the effective disposition of title must be the same whatever the nature of the property transferred. The doctrine which imputes fraud where full dominion is reserved must apply to assignments of accounts although the doctrine of ostensible ownership does not. There must also be the same distinction as to degrees of dominion. Thus, although an agreement that the assignor of accounts shall collect them and pay the proceeds to the assignee will not invalidate the assignment which it accompanies, the assignment must be deemed fraudulent in law if it is agreed that the assignor may use the proceeds as he sees fit.

"In the case at bar, the arrangement for the unfettered use by the company of the proceeds of the accounts precluded the effective creation of a lien and rendered the original assignment fraudulent in law."

In the case of *In re Almond-Jones Co.*, 13 Fed. (2d) 152, the borrower assigned its accounts receivable to a bank. Upon each account in the borrower's ledger was stamped a statement that the account had for value been assigned to the bank. The list of accounts contained the same statement and was signed by the treasurer of the borrower, the assignor. The lending

bank, the assignee, was the depository of the proceeds from the accounts receivable. That money was placed in the active account of the assignor. There was an oral agreement between the parties that the bank, at any time, might take the checks of the debtors given in payment of the accounts, and apply the proceeds in the reduction of the assignor's notes. Following the rule announced in *Benedict v. Ratner*, 268 U. S. 353, the court held the assignment was invalid and said:

"It was agreed between the parties that, so long as it was satisfactory to the bank, the company should continue to collect the accounts, but that all the proceeds thereof were to be deposited with the bank. These deposits were credited in the company's active account, and were subject to its withdrawal at will, and as a matter of fact were used by the company in the course of its business, which was conducted without interference on the part of the bank. The bank exercised no other control, except that on a few occasions during the three years preceding November, 1925, it sent representatives to the company's place of business to inspect its ledgers, and to see that notice of assignment was stamped upon each account receivable . . . whether collateral consists of chattels or of accounts, reservation of dominion inconsistent with the effective disposition of title must render the transaction void. Although an agreement that the assignor of accounts shall collect them and pay the proceeds to the assignee will not invalidate the assignment which it accompanies, the assignment must be deemed fraudulent in law, if it is agreed that the assignor may use the proceeds as he sees fit. . . . The case at bar bears a striking similarity to *Benedict v. Ratner*, but differs in that, the lender being here the bank, it was agreed that the collections should be deposited therein, and that it could appropriate them at any time. This arrangement unquestionably made it easy for the bank to take control of the funds whenever it saw fit to do so; easier, in fact, than it was for Ratner

in his case to require the application of the amounts collected in payment of his loan. *But,* on the other hand, *until the lender should interfere, the privilege of the borrower to use the funds was as free in one case as in the other.* The deposit of the funds with the bank provided a means of enforcing the agreement, but did not modify either the terms of the agreement or the actual practice whereby the company used the collections without restraint in the course of its business. . . . *The bank, in the case at bar, did not in fact appropriate the funds until after it had knowledge of insolvency, and in the meantime the actual control and dominion of the funds enjoyed by the bankrupt was as unfettered* as it was in the case of *Benedict v. Ratner."* (Italics ours).

The rule enunciated in *Benedict v. Ratner,* 268 U. S. 353, and followed in *In re Almond-Jones Co.,* 13 Fed. (2d) 152, is applicable in the case at bar. Not until December 2, 1930, was the defendant corporations' unfettered use of the proceeds of the accounts receivable disturbed by the respondent lender. Until that time the actual dominion of the funds enjoyed by the corporations was as unfettered as it was in the cases cited.

*Heermans v. Blakeslee,* 93 Wash. 595, 161 Pac. 489, 97 Wash. 647, 167 Pac. 128, is not in point. Heermans, an assignee of a portion of the accounts receivable of a water company, sought an accounting from the defendant Blakeslee for moneys received by the latter through writs of garnishment issued upon a judgment rendered in favor of Blakeslee against the water company, which had assigned to Heermans present and future earnings, etc. Heermans also prayed for an order restraining Blakeslee from causing to be issued additional writs of garnishment against the debtors of the water company. The plaintiff claimed that, as assignee of the water company, he was entitled to all the moneys so acquired, and sought to be acquired, by

Blakeslee. Defendant's demurrer to the complaint was sustained and the action dismissed. The judgment was affirmed on appeal. We said:

"The complaint alleges that the suing out of the writs of garnishment is impairing appellant's contract of assignment and impairing his said security, but we find no allegations in the complaint to support these conclusions of law. Since the contract of assignment was an assignment in effect of one-half of the income of the water company, then, before the security of the appellant could be impaired, it was necessary to set out facts which would show that the particular sums garnished were the property of the appellant, or that the respondent, in issuing writs of garnishment, was taking more than one-half of the income assigned by the water company to the appellant. Since the complaint does not show these facts, it is clearly insufficient to base a cause of action upon for an accounting, or for an injunction to restrain the respondent from collecting his judgment against the water company." *Heermans v. Blakeslee,* 97 Wash. 647, 167 Pac. 128.

Appellant next contends that respondent's taking of the proceeds of the accounts receivable constitutes a voidable preference under the Federal bankruptcy act.

As we have seen, the respondent did not, for more than four months before the Seiples and the two corporations filed petitions in bankruptcy, have actual control and dominion of the corporations' accounts receivable. Respondent did have the right to take dominion, but that option was not exercised until December 2, 1930. Within less than four months, the Seiples and the two corporations filed their petitions in bankruptcy. When the respondent took charge on December 2, 1930, the assets of the two corporations aggregated $156,560.12. The liabilities of the two corporations amounted to $384,425.80. The corporations were, in fact, insolvent. Until respondent placed its

representative in charge of the borrowing corporations, the agreement of April 24, 1930, was not operative as an assignment of the accounts receivable, etc., of the defendant corporations.

The date of taking control and dominion of the subject matter of the assignment is the only one to be considered, that being the date of the perfecting (if it was ever perfected) of the assignment. That being so, the respondent took its security at a time when its debtors were insolvent, and within four months before the filing of the petitions in bankruptcy. It follows that respondent can not be permitted to retain, as against appellant, accounts collected by the respondent subsequent to December 2, 1930.

Section 60(a) of the Federal bankruptcy act defines what constitutes a forbidden preference. Section 60(b) of the act provides a remedy against such preferences—"it shall be voidable by the trustee and he may recover the property or its value from such person."

The pertinent sections of the bankruptcy act read as follows:

"(a) A person shall be deemed to have given a preference if, being insolvent, he has, within four months before the filing of the petition, or after the filing of the petition and before the adjudication, procured or suffered a judgment to be entered against himself in favor of any person, or made a transfer to (of) any of his property, and the effect of the enforcement of such judgment or transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class. Where the preference consists in a transfer, such period of four months shall not expire until four months after the date of the recording or registering of the transfer, if by law such recording or registering is required or permitted.

"(b) If a bankrupt shall have procured or suffered

a judgment to be entered against him in favor of any person or have made a transfer of any of his property, and if, at the time of the transfer, or of the entry of the judgment, or of the recording or registering of the transfer if by law recording or registering thereof is required, and being within four months before the filing of the petition in bankruptcy or after the filing thereof and before the adjudication, the bankrupt be insolvent and the judgment or transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such judgment or transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such person. And for the purpose of such recovery any court of bankruptcy, as hereinbefore defined, and any State court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction." U. S. C., Title 11, § 96.

■■■ Respondent insists that the transfer to it was not voidable, as it had no reason to believe the assignors were insolvent at the time the assignment was made, or any time thereafter until December, 1930.

So far as the agreement of April 24, 1930, is concerned, that date is not controlling. The assignment became effective, if ever, December 2, 1930, as stated above. At that time, it may be that respondent did not know the assignors were insolvent. Respondent had every reason to believe, under the facts recited above and which need not be reiterated, that, when it took charge of the corporations in December, 1930, those corporations were insolvent. It was not a matter of suspicion. It must have known. It will not be permitted to close its eyes to facts which were sufficient to put an ordinarily prudent man upon inquiry.

"But a transfer is not voidable under section 60b in the absence of the 'reasonable cause to believe', etc., expressed in that section, even if other elements

of a preference accompany it. The requirement of 'reasonable cause to believe' does not demand actual knowledge or actual belief, nor does a mere suspicion in the creditor's mind charge him with having 'reasonable cause'. In determining whether the creditor had reasonable cause to believe that a preference was intended, facts which are sufficient to put an ordinarily prudent man upon inquiry charge the creditor with all the knowledge he could have acquired by the exercise of reasonable diligence." 3 R. C. L. 278, § 105.

Contrary to the contention of appellant, the deeds taken by respondent as security and unrecorded until December 2, 1930, were valid as against appellant. The three deeds in question were executed by the Seiples in June, July and October, 1930, or more than four months prior to the filing of the petitions in bankruptcy. It does not appear that, at the time of the transfer of that real property, the corporations were, or that the respondent had reason to believe that the corporations were, insolvent. The conveyances were made for a valuable consideration. Appellant was not a subsequent purchaser or mortgagee of the property transferred to the respondent. The parties protected by our recording statute are subsequent purchasers or mortgagees in good faith, for a valuable consideration, "from the same vendor, his heirs or devisees, of the same real property or any portion thereof, whose conveyance is first duly recorded." Rem. Rev. Stat., § 10596-2.

"At common law, recording was not necessary to the validity of the deed, or to make it effective against all subsequent conveyances; and such is the law now, except so far as the recording acts have expressly, or by necessary implication, limited their effect and operation. The registry of a deed adds nothing to its effectiveness as a conveyance; all that it accomplishes is to impart notice; and it is a rule of universal appli-

cation that an unrecorded deed, mortgage or other instrument affecting the title to land is valid as between the parties thereto, and their heirs, and those claiming under the grantee, and against everyone else who is not within the protection of the recording acts." 23 R. C. L. 230, § 95.

The appellant trustee in bankruptcy, representing the creditors of the bankrupts, is entitled, as against the respondent, to the proceeds that have been derived and may be obtained from the estates of the bankrupts, with the exception of the real property conveyed by the Seiples to the respondent. The three conveyances above described are valid as against appellant.

The judgment is reversed, and the cause remanded with direction to proceed in accordance with the views herein expressed.

TOLMAN, PARKER, MITCHELL, and HOLCOMB, JJ., concur.